UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

INTERNATIONAL UNION OF          )
PAINTERS & ALLIED TRADES,       )
DISTRICT COUNCIL NO. 4 et al.,  )
                                )
        Plaintiffs,             )
                                )
    v.                          )        Case No. 1:23-cv-341-GWC
                                )
BISON PAINTING & DECORATING     )
CORP. and PAUL SCOURAS,         )
                                )
        Defendants.             )

**ORDER ON SECOND MOTION FOR DEFAULT JUDGMENT**
**(Doc. 16)**

Plaintiffs[1] filed their Complaint in this case in April 2023, alleging that Bison Painting

& Decorating Corp. ("Bison") and Paul Scouras—Bison's "controlling officer and managing

agent"—violated the Employee Retirement Income Security Act (ERISA), the Labor-

Management Relations Act (LMRA), the collective bargaining agreement, and the trust

agreements with the union's funds "by failing, refusing and/or neglecting to comply with specific

statutory and contractual obligations." (Doc. 1 ¶¶ 2, 16.)  Plaintiffs allege that Mr. Scouras

"breached his fiduciary duty to the Funds by failing to effect payment of employee fringe benefit

contributions from Defendant BISON to the Funds." (*Id.* ¶ 3.)  Currently pending is Plaintiffs'

Second Motion for Default Judgment. (Doc. 16.)

---

[1] In addition to the above-captioned union, the plaintiffs in this case include individuals serving as trustees for the union's Health & Welfare Fund, its Finishing Trades Institute, and its Labor Management Cooperative Initiative Trust Fund.

## Procedural History

After Defendants failed to timely respond to the Complaint, Plaintiffs sought a clerk's entry of default. (Doc. 6.) The clerk issued an entry of default under Fed. R. Civ. P. 55(a) on June 14, 2023. (Doc. 7.) Plaintiffs then sought entry of default judgment by the clerk in the amount of $164,953.15 under Fed. R. Civ. P. 55(b)(1). (Doc. 9.) Noting that $13,500 of the requested amount constituted attorney fees, the court ruled that judgment under Rule 55(b)(1) was not appropriate and suggested that Plaintiffs seek judgment under Rule 55(b)(2). (*See* Doc. 11.)

Plaintiffs filed a motion for default judgment under Rule 55(b)(2) on October 4, 2023. (Doc. 12.) On April 5, 2024, the court noted that Defendants had not responded to the motion and ordered Defendants to show cause within 30 days why the motion should not be decided on the papers. (Doc. 14.) Defendants did not respond to that show-cause order. Ruling on the papers, the court denied the October 2023 motion, reasoning that Plaintiffs' submission lacked a memorandum of law and did "not demonstrate that the allegations of the Complaint establish the defendants' liability on each cause of action." (Doc. 15.) The court stated that the denial was without prejudice to renewal of the motion "with appropriate support." (*Id.*)

Plaintiffs filed their Second Motion for Default Judgment under Rule 55(b)(2) on June 12, 2025. (Doc. 16.) That motion includes a memorandum of law (Doc. 16-1) and supporting materials, including an affidavit and exhibits (not previously submitted) from the union's business manager and secretary treasurer, Michael Hogan (Doc. 16-2), and updated affidavits and exhibits from Plaintiffs' accounting manager, Susan Bernat (Doc. 16-5), and from Plaintiffs' counsel, Candace Morrison (Doc. 16-9). Defendants did not respond to the Second Motion, and on August 21, 2025, the court issued an order for Defendants to show cause within

2

30 days why the motion should not be granted. (Doc. 18.) The copy of the August 21 show-cause order was returned as undeliverable. Defendants have not advised the court of their current mailing address.

## Background

The following facts are derived from the Complaint and are taken as true because Defendants have failed to answer or otherwise defend.

Plaintiff International Union of Painters & Allied Trades, District Council No. 4 (the "Union") is a labor organization that maintains an office in Cheektowaga, New York. (Doc. 1 ¶¶ 6–7.) The Union—and employers that have signed collective bargaining agreements with the Union—collect dues and assessments, which the employers deduct from employees' wages and remit to the Union. (*Id.* ¶ 8.) Twelve individual plaintiffs are trustees of "jointly administered, multi-employer, labor-management trust funds" constituting an employee benefit plan to provide health and welfare benefits for Union employees (the "Health Fund"; "Health and Welfare Fund"; or "H&W Fund"). (*Id.* ¶¶ 9–10.) Thirteen individual plaintiffs (some of whom are also Health Fund trustees) are trustees of the Union's "Finishing Trades Institute of Western and Central New York" ("DC4 FTI"), an employee benefit plan whose purpose is to provide apprentice training and journeyperson retraining for Union employees. (*Id.* ¶ 11.) Four individual plaintiffs (three of whom are also trustees of the Health Fund and the DC4 FTI) are trustees of the Union's "Labor Management Cooperative Initiative" trust fund (the "STAR Fund"), the purpose of which is to expand job opportunities for Union painters, allied tradespeople, and their signatory contractors. (*Id.* ¶ 12.) The court refers to the Health Fund, the DC4 FTI, and the STAR Fund collectively as the "Funds."

3

Defendant Bison was at all relevant times a business corporation with a principal place of business in Kenmore, New York. (*Id.* ¶ 15.) Defendant Mr. Scouras was at all relevant times Bison's controlling officer and managing agent. (*Id.* ¶ 16.) Bison was a signatory to a collective bargaining agreement with the Union (the "CBA"). (*Id.* ¶ 18.) The CBA binds Bison to the Trust Agreements for the Funds. (*Id.* ¶ 19.)

The terms of the CBA (*see* Docs. 1-1, 1-2) and the Trust Agreements for the Health Fund (Doc. 1-3) and for DC4 FTI (Doc. 1-4) required Bison to:

a. File contribution reports (sometimes referred to as "Remittance Reports") with the Funds by the fifteenth (15th) day of the month following the month during which the work covered by the applicable CBA (hereinafter referred to as "covered work") was performed;

b. Pay by the fifteenth (15th) day of the month following the month during which the covered work was performed monetary contributions to the Health Fund at the rates set forth in the CBA for all hours of work performed by Defendant BISON's employees covered by the CBA;

c. Pay by the fifteenth (15th) day of the month following the month during which the covered work was performed monetary contributions to the DC4 FTI at the rates set forth in the CBA for all hours of work performed by Defendant BISON's employees covered by the CBA; and

d. Pay contributions to the STAR Fund at the rates set forth in the CBA by the fifteenth (15th) day of the month following the month during which the covered work was performed by its employees;

e. Deduct Union membership dues and dues assessments from the wages of each of its employees performing covered work at the rates set forth in the CBA and remit such deducted Union membership dues to Plaintiff Union by the fifteenth (15th) day of the month following the month during which the covered work was performed by its employees.

(Doc. 1 ¶ 25(a)–(e).)

Plaintiffs allege Bison employed Union members from April 2 to December 25, 2022, and performed work for Bison covered by the CBA. (*Id.* ¶ 39.) Plaintiffs further allege that Mr. Scouras decided that Bison would not pay contributions to the Health Fund and DC4 FTI for

4

work performed by Bison employees from April 2 to August 24, 2022, and for September 26 to December 25, 2022 (the "Relevant Period"). (*Id.* ¶ 40.) Bison failed to remit employee fringe benefit contributions to the Health Fund and to DC4 FTI for work performed by its employees covered by the CBA during this period. (*Id.* ¶ 41.) Plaintiffs further allege that Bison failed to remit contributions to the STAR Fund for work performed by its employees covered by the CBA during the Relevant Period. (*Id.* ¶ 51.) In addition to the alleged failures to remit contributions to the Funds, Bison failed to remit any of the Union membership dues or dues assessments during the Relevant Period. (*Id.* ¶ 59.)

The following additional facts are derived from Plaintiffs' submissions in support of their Second Motion for Default Judgment.

On November 3, 2022, Bison, the Union, and the Funds entered into a Forbearance Agreement under which Bison acknowledged indebtedness to the Union and the Funds "in the amount of $215,027.31 for delinquent fringe benefit contributions, as well as dues and assessments, for the period April 1, 2022, through August 31, 2022." (Doc. 16-3 at 3.) Bison failed to make the January 1 and February 1, 2023, payments as required under the Forbearance Agreement. (Doc. 16-2 ¶ 9.) Counsel sent Bison a Notice of Default on February 22, 2023. (Doc. 16-4.) Bison failed to cure the default. (Doc. 16-2 ¶ 10.)

Sometime in 2022 or 2023, the New York State Department of Labor Bureau of Public Works ("NYSDOL") received a complaint alleging that Bison failed to pay all statutorily required prevailing wage benefits on certain public works projects on which Union members were employed by Bison. (Doc. 16-2 ¶ 13.) The NYSDOL investigated and found Bison failed to pay such benefits. (*Id.* ¶ 14.) Bison was unable to make payments to satisfy the NYSDOL investigation. (*Id.* ¶ 15.) The NYSDOL pursued the amounts Bison owed from the prime

contractors that subcontracted work to Bison on the relevant prevailing wage projects. (*Id.* ¶ 16.) As a result, the Union received payment from various prime contractors in January and February 2024 compensating for money owed to the Union members by Bison. (*Id.* ¶ 17.) The Union and Funds credited the total amount that Bison owes to account for the money received from the NYSDOL investigation. (*Id.* ¶ 18.)

## Analysis

### I.   Jurisdiction

There is no question that the court has federal question jurisdiction in this case based on the claims under ERISA and the LMRA. Although recent mailings to Defendants' address in Kenmore, New York, have been returned as undeliverable, personal jurisdiction is evaluated at the time that the complaint was filed, at which time Bison was a New York business entity and Mr. Scouras maintained a residence in New York.

### II.   Rule 55(b)(2) Considerations

As the court previously stated in this case, when evaluating a motion for default judgment under Rule 55(b)(2), "the [c]ourt must consider the willfulness of the default, the existence of a meritorious defense, and the level of prejudice that the non-defaulting party may suffer." (Doc. 15 (alterations in original; quoting *Grice v. McMurdy*, No. 18-CV-6414, 2020 WL 90770, at *3 (W.D.N.Y. Jan. 8, 2020)).)[2] Here, Defendants have failed to respond to the complaint, to the first motion for default judgment, to the second motion for default judgment, and to the court's order to show cause, all of which support a finding of willfulness.

---

[2] Reviewing the first motion for default judgment, the court indicated that Plaintiffs should have addressed the three factors relevant to a Rule 55(b)(2) motion. (Doc. 15.) Plaintiffs' second motion for default judgment still lacks analysis on these points. The court has reviewed these issues on its own.

Defendants have not asserted any defenses in an answer or otherwise in this case. Bison acknowledged its indebtedness to the Union and the Funds in the November 2022 Forbearance Agreement. (Doc. 16-3.) The $215,027.31 sum in that agreement, however, included interest under a payment plan that the parties contemplated at the time. It thus does not constitute the appropriate measure of damages. Nevertheless, the Forbearance Agreement supports the general proposition that Bison owed Plaintiffs for the missed remittances and contributions during the Relevant Period as described in the Complaint, and further supports the conclusion that there are no applicable defenses to liability.

Finally, denying Plaintiffs' motion for default judgment would prejudice them because "they have no additional steps available to secure relief in this Court." *Legacy Cap. 26 LLC v. Valley Unique Elec. Inc*, No. 24-CV-6349, 2026 WL 406706, at *6 (W.D.N.Y. Feb. 13, 2026) (quoting *Williams v. Harry's Nurses Registry, Inc.*, No. 23-CV-6661, 2025 WL 2481745, at *7 (E.D.N.Y. Aug. 28, 2025)). Because all three factors weigh in favor of entry of default judgment, the court proceeds to consider liability and damages.

## III.   Liability

The court previously ruled in this case that Plaintiffs have the burden to "demonstrate that the allegations of the complaint establish the defendants' liability on each cause of action." (Doc. 15.) Plaintiffs' June 2025 motion for default judgment corrects the insufficient showing in the October 2023 motion and demonstrates that the allegations in the April 2023 complaint establish Defendants' liability on each of the three causes of action in that pleading.

### A.   ERISA

As against Bison, Count 1 asserts that failures to pay the Health Fund and the DC4 FTI violate the CBA and Section 515 of ERISA, 29 U.S.C. § 1145. (Doc. 1 ¶ 47.) The remaining

counts similarly assert that Bison failed to pay the STAR Fund (Count 2) and to pay membership dues and dues assessments (Count 3). (*See id.* ¶¶ 49–61.) "To establish a violation of Section 515, Plaintiffs must show that Defendant '(1) is an employer; (2) is bound by a [collective bargaining agreement] that required payment of contributions; and (3) failed to make those contributions.'" *Exhibition Emps. Loc. 829 I.A.T.S.E. Pension Fund v. Nat'l Convention Servs., LLC*, No. 24-cv-07833, 2025 WL 2253741, at *3 (S.D.N.Y. Aug. 7, 2025) (quoting *Trs. of Pavers & Road Builders Dist. Council Welfare, Pension, & Annuity Funds v. Rici Corp.*, No. 23-CV-5856, 2024 WL 4314958, at *4 (E.D.N.Y. Aug. 19, 2024)). As against Bison, the allegations in the complaint support each of these elements.

The complaint alleges that Bison is an employer within the meaning of ERISA. (Doc. 1 ¶ 15.) The complaint also includes detailed allegations regarding the terms of the applicable CBA (*id.* ¶¶ 18–25) and copies of the agreement itself (Docs. 1-1, 1-2.). Finally, the complaint alleges that Bison failed to remit contributions in accordance with the terms of the CBA. This is further evidenced by Bison's acknowledgement of the indebtedness in the November 2022 Forbearance Agreement.

Counts 2 and 3 do not name Mr. Scouras as a defendant. Count 1 asserts breach of fiduciary duty against him in violation of ERISA Section 409(a), 29 U.S.C. § 1109. (Doc. 1 ¶ 46.) Section 1002(21)(A) of Title 29 defines a "fiduciary" with respect to a plan in pertinent part as a person who "exercises any authority or control respecting management or disposition of its assets." Citing *LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997), Plaintiffs contend that Mr. Scouras was a "fiduciary" because "he had authority and control over management or disposition of assets of the Funds, and the Funds were in his possession." (Doc. 16-1 at 12.)

8

Careful analysis is necessary here because "[o]rdinarily, unpaid contributions are not assets of an employee benefit fund until after they are paid." *Trs. of Sheet Metal Workers' Int'l Ass'n Loc. Union No. 28 Benefit Funds v. Maximum Metal Mfrs., Inc.*, No. 14-CV-2890, 2015 WL 5771853, at *5 (S.D.N.Y. Oct. 2, 2015) (citing *In re Halpin*, 566 F.3d 286, 290–91 (2d Cir. 2009)).  The contributions at issue in Count 1 are employer contributions, thus *LoPresti*—which discusses *employee* contributions—is distinguishable.  *See In re Halpin*, 370 B.R. 45, 49 (N.D.N.Y. 2007) (distinguishing *LoPresti* on this basis), *aff'd*, 566 F.3d 286 (2d Cir. 2009).  The Second Circuit has held that "in the absence of provisions to the contrary in the relevant plan documents, unpaid contributions are not assets of the plan." *Halpin*, 566 F.3d at 287.

Plaintiffs have not supplied analysis as to whether the plan documents in this case altered the presumption that unpaid amounts are debts, rather than assets held in trust.  Some CBAs include language that does just that.  *See Maximum Metal*, 2015 WL 5771853, at *6 (CBA stated that employer contributions would be "considered assets of the respective Funds and title to all monies paid into and/or due and owing said Funds shall be vested in and remain exclusively in the Trustees of the respective Funds").  Although the CBA in this case does not include such a clause, the declarations of trust for the funds at issue in Count 1 include language stating that the assets of the funds consist of, among other things, "the sums of money that have been *or will be paid or which are due and owing* to the Fund by the Employers as required by Collective Bargaining Agreements." (Doc. 1-3 at 5 (Health Fund); Doc. 1-4 at 6 (DC4 FTI) (emphasis added).)  The court therefore concludes that the unpaid contributions at issue in Count 1 are plan assets, that Mr. Scouras was a "fiduciary" for purposes of ERISA, and that he is personally liable for the losses to the Health Fund and to DC4 FTI.  *See* 29 U.S.C. § 1109.

9

### B.     LMRA

Counts 1–3 do not expressly mention the LMRA, but insofar as they incorporate earlier allegations in the complaint (Doc. 1 ¶¶ 35, 49, 56), it appears that Plaintiffs also seek to establish liability under the LMRA.  "An employer's violation of a CBA can give rise to a claim under the [LMRA]." *Gilmore v. Univ. of Rochester*, 654 F. Supp. 2d 141, 151 (W.D.N.Y. 2009); *see also Rici*, 2024 WL 4314958, at *5 ("[A] breach of a CBA is a claim under Section 301 of the LMRA."), *report and recommendation adopted* (E.D.N.Y. Sept. 26, 2024).  The court therefore concludes that the LMRA is an additional basis of liability in this case.[3]

## IV.     Damages

Plaintiffs seek damages consisting of unpaid delinquent contributions and unremitted union membership dues and dues assessments; interest; and attorney fees.  The amounts requested in the Rule 55(b)(2) motion differ from the amounts stated in the complaint because, as described above, the Union and Funds credited the total amount that Bison owes to account for the money received from the NYSDOL investigation.  It does not appear, however, that any of the documents in the record indicate the dollar amount of that credit.

### A.     Delinquent Amounts

Plaintiffs' accounting manager, Ms. Bernat, has supplied a summary of the delinquent contributions (Doc. 16-6), supported by copies of remittance reports (Doc. 16-7).[4]  Accepting the summary as correct, the court concludes that the delinquent amounts are as follows:

---

[3] The LMRA can entitle a plaintiff "to the unpaid contributions not covered by ERISA but unpaid or paid late in violation of the CBAs or other agreements." *Rici*, 2024 WL 4314958, at *5.  Plaintiff has not identified any such contributions not covered by ERISA, so it does not appear that LMRA liability supports any additional damages beyond those calculated below.

[4] Not all of the figures on the remittance reports match the figures on the summary.  It appears that the remittance reports indicate the hourly rates for the various relevant Funds (e.g., "H&W," "DC4FTI," "STAR") and for the union dues, but that the summary does not apply those

- Health Fund: $94,212.51

- DC4 FTI: $6,675.06

- STAR Fund: $1,251.55

- Union Dues: $17,366.75

(*See* Doc. 16-6.)  The Health Fund and DC4 FTI figures sum to $100,887.57.  Adding the STAR

Fund and Union Dues figures brings the total to $119,505.87.

## B.   Interest

Under ERISA, "interest on unpaid contributions shall be determined by using the rate

provided under the plan, or, if none, that rate prescribed under section 6621 of Title 26."

29 U.S.C. § 1132(g)(2).  Here, the plan appears to provide for an interest rate.  In her June 2025

affidavit, Ms. Bernat calculated interest at 1% per month, the rate specified in the DC4 Funds'

Collection Policy.  (Doc. 16-5 ¶ 6.)  The cited collections policy (Doc. 16-8) is for the Health and

Welfare Fund, but the court infers that the same interest rate applies for the DC4 FTI fund.[5]  The

policy states that interest on unpaid amounts accrues at 1% per month, compounded monthly.

(Doc. 16-8 at 3.)

---

rates to the "hours worked" indicated on the reports, instead using a different number of hours
denoted on the summary as "remaining hours."  (Doc. 16-6 at 2.)  Plaintiffs have not provided an
explanation for the "remaining hours" figures, although it seems possible that these figures are
used to account for the money received from the NYSDOL investigation.

[5] Although Plaintiffs assert that Bison is liable for interest on "*all* unpaid and/or untimely
paid employee fringe benefit contributions" (Doc. 16-1 at 11 (emphasis added)), their interest
calculations do not extend to the STAR fund or to the union contributions.  The court therefore
limits the interest calculations to the unpaid Health Fund and DC4 FTI Fund: $100,887.57.

Using a 1% rate, Ms. Bernat calculated interest through the date of her June 2025 affidavit. For the Health Fund, Ms. Bernat calculated interest as $1,988.13. For the DC4 FTI Fund, she calculated interest as $140.94. These figures sum to $2,129.07. (Doc. 16-6 at 3.)

It is not entirely clear how these calculations were performed. The calculation presumably uses the date that Plaintiffs filed their complaint (April 2023) as the starting date for the interest calculation. A rate of 1% compounded monthly on $100,887.57 for 25 months (May 2023 through June 2025) is close to the $2,129.07 figure. If this interest calculation is performed from May 2023 to the present (April 2026), the interest due on $100,887.57 would be $3,535.42. The court will use the lesser amount—$2,129.07—that Plaintiffs have requested.

## C. Liquidated Damages

Plaintiffs assert in their motion that Bison is also liable for liquidated damages. (Doc. 16-1 at 11.) ERISA provides for either "double interest" or liquidated damages. *See* 29 U.S.C. § 1132(g)(2)(C) (in addition to interest on unpaid contributions, court shall award "an amount equal to the greater of—(i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan"). Plaintiffs have not cited any provisions of the plan setting a liquidated damages amount. Their calculations also do not use "double interest." The court therefore declines to include either additional amount in the award.

## D. Attorney Fees and Costs

Section 1132(g)(2) also requires that prevailing plan fiduciaries be awarded "reasonable attorney's fees and costs of the action, to be paid by the defendant." 29 U.S.C. § 1132(g)(2)(D). Plaintiffs assert that reasonable attorney fees, paralegal fees, and court costs in this case amount to $20,896.45. (Doc. 16-1 at 13–14.) As described in Attorney Candace Morrison's affidavit, this sum consists of $727.95 in court costs plus $20,168.50 in attorney fees. (Doc. 16-9 at 8.)

12

The court has reviewed the backup documentation in support of these amounts (Doc. 16-12) and concludes as follows.

The $727.95 in court costs appears to consist of the $402 filing fee, two charges for postage totaling $48.95, a $135 charge for "Electronic Research Transactions," and process service charges of $142 (comprised of one charge of $337 and one credit of $195). (Doc. 16-12 at 17, 27, 29, 61.) This court has declined to separately tax computer research, reasoning that it is "merely a substitute for an attorney's time that is compensable under an application for attorneys' fees." *Cold Spring Constr. Co. v. Spikes*, No. 11-CV-700, 2013 WL 5295654, at *4 (W.D.N.Y. Sept. 18, 2013) (quoting *Brigiotta's Farmland Produce & Garden Ctr., Inc. v. Przykuta, Inc.*, No. 05-CV-273, 2006 WL 3240729, at *28 (W.D.N.Y. July 13, 2006)). The court will therefore award the requested costs less the $135 charge for electronic research.

The $20,168.50 in attorney fees is reasonable. The presumptively reasonable fee is the reasonable hourly rate multiplied by the reasonable number of hours expended. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 186 (2d Cir. 2008). Here, Plaintiffs seek an award of attorney fees based on the following hourly rates for counsel with the Lipsitz Green Scime Cambria LLP firm:

- Attorney Mark L. Stulmaker: $305 (2022); $325 (2023); $335 (2024)

- Attorney Candace L. Morrison: $275 (2022); $285 (2023); $290 (2024); $300 (2025)

- Attorney Jeff Reina: $325 (2023).

(Doc. 16-9 ¶ 37.) These rates are in line with the rates for other counsel from the Lipsitz Green firm that this court has approved in recent ERISA cases. *See Laborers' Int'l Union of N. Am. Loc. 91 v. Insulation Coatings & Consultants LLC*, No. 20-CV-1586, 2023 WL 10368100, at *7–8 (W.D.N.Y. Oct. 17, 2023).

13

Based on the court's review of the itemized billing records submitted (Doc. 16-12), the court concludes that the hours expended are also reasonable. Each of the three attorneys involved in this case performed sufficient hours to make meaningful contributions. The three attorneys billed a total of about 75 hours on this case. (*See id.*) That is more than twice the 32.3 hours billed in *Insulation Coatings*. There are, however, differences in this case, including a relatively new labor law that required research, N.Y. Lab. § 198-e, work on the Forbearance Agreement, analysis of the NYSDOL investigation, and preparation of the two motions for default judgment.

Although Plaintiffs' first motion for default judgment was deficient in a number of ways as described in the court's text order of February 13, 2025 (Doc. 15), the court will not penalize Plaintiffs for those deficiencies. The court also notes that counsel voluntarily reduced the amount billed in multiple instances, for a total of $2,178.50. (*See* Doc. 16-12.) The court finds no basis for an across-the-board percentage-based reduction in this case, and concludes that an award in the lodestar amount of $20,168.50 is appropriate.

### E.   Post-Judgment Interest

Plaintiffs have not expressly requested or discussed post-judgment interest. However, "[t]he award of post-judgment interest is mandatory on awards in civil cases as of the date judgment is entered." *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996) (quoting 28 U.S.C. § 1961(a)).

> The post-judgment interest rate in ERISA actions is tied to the formula for calculation set forth in 28 U.S.C. § 1961(a), which provides that post-judgment interest shall be calculated form the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.

14

*Insulation Coatings*, 2023 WL 10368100, at *10 (internal quotation marks omitted), *report and recommendation adopted*, 2024 WL 1096116 (W.D.N.Y. Mar. 13, 2024).  The judgment in this case will include post-judgment interest on the total award calculated at § 1691(a)'s rate from the day the clerk enters final judgment until the date of payment.

## Conclusion

Plaintiffs' Second Motion for Default Judgment (Doc. 16) is GRANTED and default judgment will be entered against Bison Painting & Decorating Corp. on all counts and against Paul Scouras on Count 1 as follows:

- $119,505.87 in unpaid contributions and union dues;

- $2,129.07 in pre-judgment interest;

- $20,760.55 in attorney fees and costs;

- Post-judgment interest on the total award calculated at the rate set forth in 28 U.S.C. § 1961 from the day the clerk enters final judgment until the date of payment.

Dated this 8th day of June, 2026.

Geoffrey W. Crawford, Judge
United States District Court

15